UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WALTER STEWART,                           }
                                          }
    Plaintiff,                            }
                                          }
v.                                        }   Case No.: 2:22-cv-00203-RDP
                                          }
THE BOARD OF TRUSTEES for the             }
UNIVERSITY OF ALABAMA SYSTEM,             }
                                          }
    Defendant.                            }

### MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment filed by the Board of Trustees of the University of Alabama ("UAB"). (Doc. # 45).[1] The Motion has been fully briefed and is ripe for review. (Docs. # 45-47; 52-54). For the reasons discussed below, UAB's Motion is due to be granted.

### I.    BACKGROUND[2]

Plaintiff Walter Stewart, an African American male, filed this cause of action against Defendant under Title VII of the Civil Rights Act of 1964. (Doc. # 20). Plaintiff asserts that, beginning in 2011, he has consistently received less in pay and lower salary adjustments than white directors who also serve in the Student Affairs Division. (*Id.*).

---

[1] Plaintiff sues the Board of Trustees for the University of Alabama system ("Board of Trustees"). However, the alleged discrimination occurred at the University of Alabama at Birmingham ("UAB"). For purposes of brevity, the court will refer to Defendant Board of Trustees as "UAB."

[2] The facts set out in this section are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party, although factual disputes are acknowledged. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

### A.     Compensation at UAB

UAB is a research university and academic medical center located in Birmingham, Alabama. (Doc. # 46-1 at ¶ 3). The Student Affairs Division is one of many divisions within the UAB system. (Doc. # 46-2, p. 11:13-22). Student Affairs contains twenty departments and functional areas all dedicated to student engagement. (*Id.*; Doc. # 46-1 at ¶ 4).

The UAB Academic and Administrative Compensation Guidelines ("the Compensation Guidelines") govern the compensation of employees within the Student Affairs Division. (Docs. # 46-3; 46-4 at ¶¶ 3-5). Specifically, the Student Affairs Division Head oversees the process of setting up jobs within the Student Affairs Division and determining how much employees are paid within the applicable pay range. (Doc. # 46-5, pp. 21:1-26:23, 29:7-30:18). Pay ranges for jobs at UAB are set on a continuum with three salaries denoted: the minimum, which represents the average start rate within the job market; the midpoint, which represents the rate within the middle of the job market; and the maximum, which represents the average top rate within the job market. (Doc. # 46-3). The Executive Director of Compensation, who works in the Human Resources Department ("HR Compensation Department"), oversees the process of placing a value on available job positions. (Doc. # 46-5, pp. 21:1-26:23, 29:7-30:18). Then, the HR Compensation Department makes a recommendation to Division Heads on the salary a particular employee should earn based on the pay range for the position. (*Id.*). Division Heads may also request the authority from the Chief Human Resource Officer to pay employees a higher salary than the assigned valuation. (*Id.* at pp. 30:19-33:6).

The Compensation Guidelines establish five mechanisms by which employees may receive pay raises: merit increases, equity adjustments, market adjustments, promotional increases, and reclassifications. (Docs. # 46-3; 46-4 at ¶ 6).

- Merit increases are based on job performance, as measured by annual performance evaluation scores, and each department has discretion to award merit increases so long as funds are available. (Docs. # 46-3 at 6; 46-4 at ¶¶ 7-8; 46-5, pp. 38:17-39:23).

- Equity adjustments address employees' pay rates in comparison with other employees with similar jobs throughout UAB. (Doc. # 46-3 at 8). "Approved equity adjustments are not centrally funded and must be funded at the department level," but the HR Compensation Department will provide recommendations on how to financially address equity concerns. (*Id.*).

- Market adjustments address employees' pay rates in comparison with the external job market. (*Id.* at 9). For a market adjustment to occur with jobs shared across multiple departments, all department leaders must support the adjustment. (*Id.*). Market adjustments are also funded at the department level. (*Id.*).

- Promotional increases occur once an employee applies and is selected for a position with a greater pay range midpoint. (*Id.* at 10). Such a promotion may be within an employee's current department or when an employee moves to a different department. (*Id.*).

- Reclassifications include the process of modifying an existing job -- including job title, job description, and pay grade -- to fit an employee's actual job responsibilities. (*Id.* at 12-13; Doc. # 46-5, p. 68:4-19).

During the relevant time period, Dr. John Jones, Vice President of Student Affairs, ultimately made the compensation decisions for employees who worked in the Student Affairs Division, subject to the Compensation Guidelines. (Doc. # 46-2, p. 16:9-14). Dr. Jones is an African American male. (Doc. # 46-6, p. 103:13-15).

### B.     Plaintiff's Background, Employment, and Compensation

Prior to his current position, Plaintiff served in the United States Army for 26 years, retiring as a Sergeant First Class in August 2007. (Doc. # 52-1 at 2-3). While serving in the Army, Plaintiff worked as a recruiter for approximately 20 years. (*Id.* at 3). In 2004, Plaintiff obtained a Bachelor of Science Degree in Management Communications from Southern Christian University. (*Id.*). In 2016, Plaintiff obtained a Master's in Business Administration Degree from Strayer University, with a concentration in Health Sciences. (*Id.*).

After retiring from active duty in the military, Plaintiff worked as the Director of Recruitment for the Bessemer Campus of ITT Technical Institute. (*Id.*). Plaintiff worked for ITT Technical Institute from July 2007 until June 2011. (*Id.*).

On October 17, 2011, Plaintiff began working at UAB as the Veteran Services and Recruitment Coordinator. (Docs. # 20 at ¶ 1; 46-7; 52-1 at 3). When Plaintiff was hired, the Veteran Services Department was organized under UAB's Enrollment Management Division. (Docs. # 46-2, pp. 25:1-9, 27:22-28:14; 46-6, p. 33:7-9). As the Veteran Services and Recruitment Coordinator, Plaintiff increased the program's enrollment and retention of veteran students, expanded program services, increased the exposure of the veterans' program in the surrounding community, and established relationships with over 35 military installations. (Doc. # 52-1 at 4). While operating on a budget of $241,000, Plaintiff increased the revenue brought in by the Veteran Recruitment and Student Services Department to a maximum of $10.6 million. (*Id.*). Plaintiff requested that some of this money be allocated to his staff and himself, but his request was ignored. (*Id.*).

Since 2011, Plaintiff has received a rating of 4 out of 5 on all of his yearly performance evaluations, and he has never received any written disciplinary action during his tenure with UAB. (Doc. # 52-1 at 8).

Plaintiff began requesting that his position be reclassified to Director of Veteran Services, including a pay raise, as early as 2015. (Doc. # 46-6, pp. 53:14-54:4, 56:14-21). Around November 30, 2015, Plaintiff emailed the Assistant Vice President of Student Development, Health, and Wellness (M. Jacob Baggot) along with the former University Registrar (Tina DeNeen) about reclassifying his position and increasing his salary. (*Id.* at p. 35:7-11, 68:1-8; Doc. # 52-1 at 3).

In Spring 2017, UAB reorganized and housed the Veteran Services Department in the Student Affairs Division. (Docs. # 46-2, pp. 12:2-11, 25:20-22; 46-6, pp. 41:15-42:4). Since this reorganization, Plaintiff has reported to the Assistant Vice President of Student Affairs, who in turn reports to Dr. Jones. (*Id.*). When the Veteran Services Department moved to Student Affairs, the Enrollment Management Division released about half of the funding for Plaintiff's salary to Student Affairs. (Doc. # 46-2, pp. 28:3-29:21). As a result, the Student Affairs Division was responsible for funding the remainder of Plaintiff's salary and other costs to operate the Veteran Services Department. (*Id.*).

After the Veteran Services Department was relocated to the Student Affairs Division, Dr. Jones and others in the Student Affairs Division reclassified Plaintiff's position to Director of Veteran Services, effective November 2017. (Docs. # 46-2, pp. 25:23-27:2; 46-6, p. 95:5-9). As the Director of Veteran Services, Plaintiff is responsible for ensuring that VA benefits for UAB students are correctly processed and received. (Docs. # 46-1 at ¶ 6; 46-6, pp. 33:10-34:2). Plaintiff is also responsible for providing support for, aiding in the success of, and offering programs for UAB students with military affiliation. (Doc. # 46-6, pp. 33:10-38:5). This includes veterans, spouses of veterans, and dependents of veterans. (Doc. # 47 at ¶ 19). There are approximately 2,362 veterans and dependents of veterans at UAB. (Doc. # 46-6, pp. 39:23-40:7).

During the relevant timeframe and after coming under the supervision of Dr. Jones, Plaintiff repeatedly requested to have his compensation reviewed to make it comparable to other directors at

UAB and in the state of Alabama. (Doc. # 52-1 at 5). At the time he was initially hired, Plaintiff made $51,000 annually. (Docs. # 46-7; 46-8 at ¶ 4). Between October 2011 and November 2017, Plaintiff received four merit increases: a 3% raise effective October 2013 (to $52,350); a 2% raise effective October 2015 (to $53,580.60); a 1% raise effective October 2016 (to $54,116.40); and a 1% raise effective October 2017 (to $54,657.60). (Doc. # 46-8 at ¶¶ 5-8).

In 2018, the Student Affairs Division requested an equity review of Plaintiff's salary. (Doc. # 46-2, pp. 30:15-32:9). After the HR Compensation Department conducted the review, Plaintiff received an 11.6% raise effective October 2018 (to $61,000.08), which was slightly above the mid-point for his pay range. (Docs. # 46-6, pp. 101:8-102:5, 104:8-106:11; 46-8 at ¶ 9). In October 2019, Plaintiff received a 2% merit increase (to $62,220.12). (Doc. # 46-8 at ¶ 10).

During 2020, UAB did not award merit increases due to the COVID-19 pandemic. (Doc. # 46-2, p. 64:4-10). And while UAB was forced to cut some salaries, Plaintiff's salary was unaffected. (*Id.*). In October 2021, Plaintiff received a 3% merit increase (to $64,086.72). (Doc. # 46-8 at ¶ 11).

In June 2022, Student Affairs initiated another compensation review for Plaintiff's salary. (Docs. # 46-2, pp. 80:8-12, 98:4-21, 111:11-112:18; 46-4 at ¶¶ 12-17). As a result, Plaintiff did not receive a market increase. (*Id.*). Dissatisfied with the result of this review, in late 2022 Plaintiff went directly to HR about his salary. (Docs. # 46-2, pp. 66:10-67:2, 97:4-99:14; 46-6, pp. 152:22-153:18). At the time, Plaintiff's job fell within the following pay range: $52,555 minimum salary, $68,320 midpoint salary, and $85,400 maximum salary. (Doc. # 52-1 at 6). In early 2023, the HR Compensation Department conducted another review of Plaintiff's salary. (Doc. # 46-2, pp. 66:10-67:2). The HR Compensation Department also reviewed the salaries of two other directors in the Student Affairs Division: the Director of Student Involvement (Jennifer Griffin) and the Director of Off-Campus Student and Family Engagement (Meredith Kahl). (Docs. # 46-2, pp. 47:13-48:11, 77:1-79:7; 46-4 at ¶¶ 18-20; 46-6, p. 156:17-20). Both Griffin and Kahl are white. (Doc. # 47 at ¶

6

30). Based on the reviews, all three directors (Plaintiff, Griffin, and Kahl) received an 8.5% salary increase. (Doc. # 46-2, pp. 47:13-48:11, 77:1-79:7). Plaintiff's current salary is $71,620.16. (Doc. # 46-6, pp. 159:18-161:8).

While working under Dr. Jones, Plaintiff has never been paid anywhere near the maximum amount of salary for his position. (Doc. # 52-1 at 6). In fact, Dr. Jones testified that, in 2011, when Plaintiff was hired, Plaintiff's salary was the lowest salary in the Student Affairs Division. (Doc. # 46-2, p. 34:1-8).

### C.     Other Directors within the Student Affairs Division

In this case, Plaintiff claims that he is paid less than seven white Directors and two white Associate Directors within the Student Affairs Division. (Doc. # 46-9). However, in his response to Defendant's Motion for Summary Judgment, Plaintiff has specifically referenced Allison Solomon.

Allison Solomon (white female) is the ADA Compliance Officer for UAB and Executive Director of Disability Support Services. (Doc. # 46-1 at ¶ 10). Solomon oversees two separate areas: Disability Support Services and ADA Compliance. (*Id.*). The Department of Disability Support Services manages the processes for students with disabilities who seek accommodations (a total of approximately 2,135 students). (*Id.* at ¶ 11). In this role, Solomon oversees seven non-student employees and manages an annual operating budget of $1,040,815. (*Id.*). As the ADA Compliance Officer, Solomon ensures that facilities throughout UAB comply with all applicable disability laws. (*Id.* at ¶ 12). In this role, Solomon works with UAB's Campus Planning and Facilities team, the Office of Compliance & Risk Assurance, and the Office of Counsel. (*Id.*).

Solomon began working at UAB in 2003. (*Id.* at ¶ 10). As Student Affairs Specialist II, Solomon made the following salaries: $30,900 effective October 2003 and $32,735.04 effective October 2004. (Doc. # 46-10). As Program Administrator II, she made: $35,744.04 effective October 2005; $38,031.60 effective October 2006; and $39,934.08 effective October 2007. (*Id.*). Prior to

7

serving as ADA Compliance Officer, Solomon served only as the Director for Disability Support Services beginning in 2010. (Doc. # 46-1 at ¶ 10). As Director of Disability Support Services, she made: $45,924.24 effective July 2010; $51,343.32 effective October 2011; $59,044.80 effective November 2011; $60,816.12 effective October 2013; $80,000.04 effective October 2015; $82,400.04 effective October 2017; and $84,377.64 effective October 2018. (Doc. # 46-10). She then added ADA Compliance Officer to her job description in 2019 and made: $91,873.80 effective July 2017; $93,711.24 effective October 2019; and $96,991.08 effective October 2021. (*Id.*). She currently makes a salary of $99,900.84. (*Id.*).

In total, there are sixteen directors who currently work in the Student Affairs Division. (Doc. # 46-10). Out of those directors, thirteen are paid more than Plaintiff, with about half being white directors and half being black. (Docs. # 46-1 at ¶ 10; 46-10). Plaintiff acknowledges that no one has made any statement to him that indicates that his rate of pay is connected to his race in any way. (Doc. # 46-6, p. 111:12-23). Plaintiff testified that while he and his white counterparts may have different jobs, they have about the same amount of responsibility. (Doc. # 46-6, pp. 52:20-53:4, 171:7-15).

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits,

depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c), a plaintiff may not simply rest on the allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. 477 U.S. at 248, 252 ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'") (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Summary judgment may be granted if the non-moving party's "evidence [] is 'merely colorable' or [] 'not significantly probative.'" *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (quoting *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014)).

9

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "At summary judgment, the key issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Butler v. Gualtieri*, 41 F.4th 1329, 1334 (11th Cir. 2022) (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear ... that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   DISCUSSION

Plaintiff's Amended Complaint -- the operative pleading in this case -- asserts two counts against UAB. (Doc. # 20). The parties have already stipulated to the dismissal of the claim in Count II. (Docs. # 43-44). Thus, the only claim remaining against UAB is Plaintiff's race discrimination claim under Title VII. (Doc. # 20).

Title VII provides that "[i]t shall be an unlawful employment practice for an employer…to discriminate against any individual with respect to his compensation…because of such individual's race, color, religion, sex, or national origin." 42. U.S.C. § 2000e-2(a)(1); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S. Ct. 1817 (1973). "In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in h[is] favor." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019) ("*Lewis I*"). One way he can do this is by satisfying the burden-shifting framework set out in *McDonnell Douglas*. Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a prima facie case of race discrimination. *McDonnell Douglas*, 411 U.S. at 802. If plaintiff satisfies this initial burden, then the employer has the burden to show that the employer's conduct was for a legitimate, non-discriminatory purpose. *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).

And, finally, if the employer can rebut plaintiff's presumption, then the burden falls on plaintiff once again to show that the employer's proffered reason is pretext for discriminatory intent. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325-26 (11th Cir. 2011). Thus, the court starts its analysis with Plaintiff's prima facie case of discrimination.

> **A.    Plaintiff has failed to establish a prima facie case of wage discrimination based on his race.**

To state a prima facie case for wage discrimination under Title VII, a plaintiff may show that: "(1) he belongs to a racial minority; (2) he received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) he was qualified to receive a higher wage." *Walker v. Fulton Cnty. Sch. Dist.*, 624 F. App'x 683, 686 (11th Cir. 2015). While Defendant argues that Plaintiff cannot establish the second, third, and fourth elements, Defendant cites no case law in support of its arguments as to the second and fourth elements. Nor has it sufficiently developed those arguments. Instead, Defendant focuses on the third requirement – the "similarly situated comparator" element. The court will do the same.

To satisfy his initial burden, Plaintiff may show that the white directors in the Student Affairs Division are "similarly situated [to him] in all material respects." *Lewis I*, 918 F.3d at 1218. However, the Eleventh Circuit has clarified that the "all material respects" standard does not equate to a "nearly identical" standard. *Id.* When analyzing this element, "a plaintiff and h[is] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Lewis I*, 918 F.3d at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 576 U.S. 206, 231 (2015)). The *Lewis I* decision also makes clear "that a meaningful comparator analysis must remain part of the prima facie case." *Id.* at 1221-24. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."

11

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Lewis I*, 918 F.3d at 1224-25.

As noted above, Plaintiff has expressly identified only one white director as a comparator – Allison Solomon. In determining whether an individual is a proper comparator, courts have considered factors such as the length of time a person has worked for an employer, the individual's expertise, and the similarity of tasks and responsibilities they perform. *E.g., Smith v. IVM Sols., LLC*, No. 1:21-cv-00162-RAH, 2022 WL 16701100, at *6 (M.D. Ala. Nov. 3, 2022) (citing *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) and *Davis v. Dunn Constr. Co.*, 872 F. Supp. 2d 1291, 1310 (N.D. Ala. 2012)).

Here, Plaintiff has not satisfied his prima facie burden. Plaintiff and Solomon both serve as directors in the Student Affairs Division at UAB, report to Dr. Jones, and serve over 2,000 students. However, that is where any similarities between the two end. Solomon has worked for UAB since 2003, served as a director since 2010, and served as the ADA Compliance Officer since 2019. (Doc. # 46-10). As part of her responsibilities, Solomon primarily manages the processes for disability accommodations and ensures that facilities at UAB comply with applicable laws addressing disabilities. (Doc. # 46-1). She also regularly engages with three additional departments on campus in addition to the Student Affairs Division. (*Id.*). And, as Director of Disability Support Services, she manages an annual operating budget of $1,040,815. (*Id.*)

In contrast, Plaintiff has worked for Defendant since 2011 and has served as a director since 2017 (Doc. # 20 at ¶ 11), although Plaintiff also has over 20 years of experience in military recruitment (Doc. # 53 at 7). As Director of Veteran Services, Plaintiff is responsible for managing VA benefits as well as executing programming and other forms of support for veterans, spouses of veterans, and dependents of veterans. (Docs. # 46-1 at ¶ 6; 46-6, pp. 33:10-38:5; 47). The record is unclear on the amount of the current annual operating budget for Veteran Services, but as the Veteran

Services and Recruitment Coordinator, Plaintiff managed an operating budget of $241,000. (Doc # 52-1 at 4).

The Rule 56 record simply does not support a finding that Plaintiff and Solomon have "sufficiently similar" roles that "cannot reasonably be distinguished." *Lewis I*, 918 F.3d at 1228 (quoting *Young*, 576 U.S. at 231). While Solomon has been employed by UAB for twenty-one years, Plaintiff has been employed for thirteen years. The responsibilities of Solomon and Plaintiff are not comparable. Solomon is responsible for determining the accommodations needed by students while also meeting with the appropriate departments at UAB to ensure those facilities comply with the relevant law. Plaintiff engages almost exclusively with veterans and those affiliated with veterans to ensure their success at UAB. Plaintiff does not point to any evidence to show how these two roles are sufficiently similar to make Solomon a viable comparator.

Further, Plaintiff admits that his responsibilities and Solomon's responsibilities are "quite different." (Doc. # 46-6, p. 182:21-23). As Plaintiff testified, "when I see my white counterparts and I see their salaries and I see what I make and I see what I bring to the table, and I see these are new directors, some of them, and I said in our job descriptions, yeah we got different jobs, but my responsibility is just as important as theirs." (Doc. # 46-6, pp. 52:20-53:4). Plaintiff's admission that he has different job responsibilities than Solomon weighs against finding that Solomon is a "similarly situated comparator" in this case. *See Sumerlin v. AmSouth Bank*, 242 F. App'x 687, 690 (11th Cir. 2007) (considering Plaintiff's admission that "all of the payroll representative 'had different duties'" against find a similarly situated comparator). While Plaintiff argues that his role is "just as important" as Solomon's role, the subjective worth that Plaintiff attributes to his role as Director of Veteran Services does not indicate that his job is "similarly situated in all material respects" to that of the Director of Disability Support Services and ADA Compliance Officer. *Lewis*

13

*I*, 918 F.3d at 1218. Therefore, the court finds that Plaintiff has failed to satisfy his burden under the *McDonnell Douglas* framework because he has not identified a proper comparator.

> **B.  Plaintiff has not shown that Defendant's proffered reason for Plaintiff's salary is pretext for race discrimination.**

Although Plaintiff has not established a prima facie case, for a complete analysis, the court proceeds to evaluate whether UAB's explanation about his pay is a pretext. In doing so, the court concludes that even if Plaintiff had satisfied his burden of establishing a prima facie case (and, to be clear, he has not done so), the Rule 56 record before the court shows that UAB is entitled to summary judgment.

Assuming only for purposes of this analysis that Plaintiff has made the initial showing of a prima facie case, and thereby raised a presumption that his race motivated his employer to treat him unfavorably, *Smith,* 644 F.3d at 1325-26, "the burden then shifts to [UAB] to rebut this presumption by producing evidence that [its] action was taken for some legitimate, non-discriminatory reason." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1272. "If the employer meets its burden of production, the presumption of discrimination raised by the plaintiff's prima facie case is rebutted and thus disappears." *Smith*, 644 F.3d at 1325-26. Finally, if the presumption is rebutted, "the inquiry proceeds to a new level of specificity, whereby the plaintiff must show the employer's proffered reason to be a pretext for unlawful discrimination." *Id*. (quotations omitted).

The court finds that Defendant has met its exceedingly light burden, *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1312 (11th Cir. 2016), and produced evidence showing a legitimate, non-discriminatory reason for Plaintiff's salary. Defendant explains that any disparity between Plaintiff's salary and that of the other directors within the Student Affairs Division is on account of the difference in the market rate for each position. (*See* Docs. # 46-1 at ¶ 29; 46-3 at 9-10; 46-4 at ¶ 24; 46-5, pp. 24:19-27:21, 62:8-13, 63:11-65:13). The record shows, and Plaintiff does not dispute, that

14

other department heads had different responsibilities and that Plaintiff's salary was consistent with the market rate for his position. (Doc. # 46-4 at ¶¶ 12-17; 46-2, pp. 80:8-12, 98:4-21, 111:11-112:18). And, in the past, in those instances where the HR Compensation Department determined that his salary was below the market rate and his pay range, Plaintiff received a raise. (*See* Docs. # 46-2, pp. 30:15-32:9; 46-6, pp. 101:8-102:5, 104:8-106:11; 46-8 at ¶ 9). Thus, Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's lower salary.

In an attempt to show Defendant's reason is pretext for discrimination, Plaintiff highlights the authority Dr. Jones has to set the salary for his employees anywhere in the applicable pay range. (Doc. # 46-5, pp. 24:19-26:23, 29:7-31:18, 33:16-34:8). Plaintiff also points to the ability Dr. Jones has to petition to pay his subordinates at higher salaries than the maximum salary calculated by the HR Compensation Department. (*Id.*). However, Plaintiff undercuts his own argument. As Plaintiff testified, "the problem that I've always had is that my supervisor…never knew and still don't know what we do in veteran services." (Doc. # 46-6, p. 171:11-15). Plaintiff has acknowledged that this lack of understanding from his supervisors is not a problem that is tied to his race. (*Id*. at p. 171:17-19). In fact, Dr. Jones is himself black and there are multiple (six) other directors in Student Affairs who are black. (Docs. # 46-1 at ¶ 28; 46-10). Therefore, because Plaintiff cannot show that Defendant's legitimate, non-discriminatory reason for his salary is pretext for race discrimination, Plaintiff cannot satisfy his burden under *McDonnell Douglas*.

### C. Plaintiff has not pointed to circumstantial evidence in the record that creates a triable issue concerning Defendant's alleged discriminatory intent.

As explained above, the court concludes that Plaintiff has failed to satisfy his burden under the *McDonnell Douglas* framework. However, the court does not end its analysis there. As the Eleventh Circuit has noted (and as Plaintiff argues here):

> '[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment

15

motion in an employment discrimination case.' Even without similarly situated comparators, 'the plaintiff will always survive summary judgment if he … presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'

*Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (quoting *Smith*, 644 F.3d at 1328).

Plaintiff has not presented sufficient evidence to create a genuine issue of fact as to whether his salary was affected by race discrimination by Defendant. To support his argument, Plaintiff relies heavily on the fact that he was the lowest paid director in the Student Affairs Division at the time he was hired. (Doc. # 46-2, p. 34:1-8). Because he was hired at such a low rate, Plaintiff contends that "he cannot crack the upper echelon of the pay scale like the white directors" and remains "locked into a discriminatory pay grade." (Doc. # 53 at 15). Plaintiff points to Solomon once again in an effort to bolster this theory. He argues that, in November 2023, Solomon received a 29% pay increase while he received a 9% pay increase. (*Id.*) However, what Plaintiff fails to note is any evidence in the record showing that this discrepancy is due to race. In fact, he merely recants this assertion: "[Plaintiff] has for years consistently received less in pay or salary adjustments than his white counterparts. It has been this way from the beginning. Thus, a jury should decide whether these salary discrepancies are benign or evidence discriminatory intent." (*Id.* at 15-16). Such an argument ignores an essential part of a summary judgment motion: that a non-moving party must put forth *facts* showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324 (holding that to survive the summary judgment stage of litigation, a plaintiff must show that there is a genuine issue of material fact to bring before the jury). "A party cannot defeat summary judgment by relying upon conclusory allegations." *Yellow Pages Photos, Inc. v. YP, LLC*, 856 F. App'x 846, 854 (11th Cir. 2021) (citing *Hill v. Oil Dri. Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006)).

The majority of Plaintiff's arguments hinge on his belief that he has been treated unfairly by Defendant. However, "Title VII does not 'replace employers' notions about fair dealing in the workplace with that of judges.'" *Herron-Williams v. Ala. State Uni.*, 805 F. App'x 622, 631 (11th Cir. 2020) (quoting *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015)). It is neither the role of the court nor the jury to address Plaintiff's concerns about being undervalued by his employer. Therefore, the court finds that Plaintiff has not presented "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Lewis II*, 934 F.3d at 1185 (*Smith*, 644 F.3d at 1328).

## IV.   CONCLUSION

Although this authority has perhaps been cited too often by district courts in assessing summary judgment motions, it is directly applicable here: this court does not sit as a super-personnel board charged with the responsibility of determining what is a fair or equitable pay rate. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The only question before the court is whether Plaintiff's pay rate was affected by race discrimination. There is no evidence in the Rule 56 record that it was.

For the reasons discussed above, UAB's Motion for Summary Judgment (Doc. # 45) is due to be granted.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

**DONE** and **ORDERED** this July 25, 2024.

R. DAVID PROCTOR
CHIEF U.S. DISTRICT JUDGE